

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 15, 2016**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 15-34814-sgj-11** |
| **FOREST PARK REALTY PARTNERS,** | § | **Chapter 11 (Jointly Administered)** |
| **III, L.P.,** | § | |
| | § | |
| Debtor. | § | |

---

| | | |
|---|---|---|
| **MANCHESTER EB-5, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | **Adversary No. 16-03042-sgj** |
| | § | |
| **FOREST PARK REALTY PARTNERS** | § | |
| **III, L.P.,** | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT ON
MANCHESTER EB-5, LLC'S REQUEST FOR DECLARATORY JUDGMENT THAT IT
IS ENTITLED TO EARNEST MONEY AND REASONABLE ATTORNEY'S FEES IN
CONNECTION WITH PREPETITION PURCHASE AND SALE AGREEMENT**

## I.     INTRODUCTION

This Memorandum Opinion and Order is vaguely reminiscent of a law school first year

Contracts class examination.  It resolves disputes stemming from a prepetition Purchase and Sale

Agreement (the "PSA") entered into by Forest Park Realty Partners III, LP ("Seller") in March

2015, approximately eight months before it filed a Chapter 11 bankruptcy case.  The PSA

pertained to a parcel of real property (the "Vacant Lot") owned by Seller, which was adjacent to

its state-of-the-art hospital properties, which were in financial distress.  The Vacant Lot was an

unencumbered and unutilized asset that Seller had decided to sell.  In the PSA, as amended and

extended from time to time, Seller agreed to sell the Vacant Lot to Manchester EB-5, LLC

("Purchaser"), for a cash price of $4.1 million.  Purchaser deposited $200,000 of earnest money

(the "Earnest Money") into an escrow account over time, pursuant to the terms of the PSA.  The

sale of the Vacant Lot was never consummated—in fact, Seller filed its chapter 11 bankruptcy

case on the very afternoon that the sale had been scheduled to close (after many consensual

extensions of the closing date that had been requested by Purchaser, with Purchaser depositing

additional Earnest Money with each extension).  Many months after Seller filed its Chapter 11

case, it eventually sold the Vacant Lot to another party (*i.e.,* a large hospital organization that

bought substantially all of Seller's assets).  The above-referenced adversary proceeding (the

"Adversary Proceeding") was filed by Purchaser seeking a declaration that ***it—not Seller***—is

now entitled to the $200,000 of Earnest Money that it deposited prepetition.[1]  Purchaser has

---

[1] Originally, Benchmark Title LLC ("Benchmark") was also a defendant in this Adversary Proceeding, as it
was the holder of the Earnest Money.  On May 16, 2016, this court entered an Agreed Order Granting Motion of
Benchmark Title, LLC to Deposit Funds into the Registry of the Court and Dismissing Claims Against Benchmark

argued that this is a simple matter of contract interpretation and—if somehow it is not—that basic contract law principles also entitle it to a refund of the Earnest Money.

Before the court now is Purchaser's motion for summary judgment.[2]  Purchaser specifically contends that:  (1) under the clear and unambiguous terms of the PSA, it had the right to—and under the undisputed facts ***did***—terminate the PSA in writing, a few hours before Seller filed bankruptcy, because Seller advised Purchaser that it was contemplating filing bankruptcy (which was a failure of a representation and warranty of Seller in the PSA); (2) such written termination entitled Purchaser to a refund of the Earnest Money under the clear terms of the PSA; and (3) there is no genuine issue of disputed fact that requires a trial—*i.e.,* Purchaser is entitled to a refund of the Earnest Money pursuant to the clear terms of the PSA.  Additionally, in response to a contention of Seller that—***days prior to Purchaser's purported written termination of the PSA***—Purchaser ***repudiated*** and ***anticipatorily breached*** the PSA with certain oral communications (as later described), or that there may at least be a fact issue that there was an earlier repudiation/anticipatory breach by Purchaser before its purported written

---

[DE # 8 in the AP], whereby Benchmark deposited $199,000 into the registry of the court (note, Benchmark was entitled to deduct $1,000 from the $200,000 it held in escrowed funds for its attorney's fees) and Benchmark was dismissed from the Adversary Proceeding with prejudice.  Note that references to "DE # __ in the AP" throughout this Memorandum Opinion and Order refer to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Clerk in this Adversary Proceeding.

[2] In ruling on the Motion for Summary Judgment, the court refers to:

(1) Purchaser's Motion for Summary Judgment [DE # 12 in the AP] (the "Motion"), Brief in Support [DE # 13 in the AP] (the "Brief"), and Appendix [DE # 14 in the AP] ("Purchaser App." and, collectively with the Motion and the Brief, the "Motion for Summary Judgment");

(2) Seller's Response to the Motion for Summary Judgment [DE # 16 in the AP] ("Seller Response"), Brief in Support [DE # 29 in the AP] (the "Brief"), and Appendix [DE # 31 in the AP] ("Seller App." and, collectively with Seller Response and the Brief, the "Response"); and

(3) Purchaser's Reply Brief in Support of the Motion for Summary Judgment [DE # 33 in the AP] (the "Reply").

termination, Purchaser contends that there is no credible evidence offered by Seller that Seller ever materially changed its position in possible reliance on Purchaser's alleged repudiation and anticipatory breach (and certainly did not send any written notification that it thought Purchaser was in default, nor terminated the PSA and made demand for the Earnest Money). Thus, viewing the facts in the light most favorable to Seller, and assuming Purchaser *did* commit a repudiation and anticipatory breach of the PSA with certain oral words, Purchaser still, as a matter of law, was able to—and did—later *retract* the repudiation/anticipatory breach (with words and conduct indicating a continued interest in going forward with the transaction) and, eventually, effectively terminated the PSA in writing (entitling Purchaser to the Earnest Money). In response, Seller has argued that Purchaser did, indeed, repudiate/anticipatorily breach the PSA (or at least there are disputed fact issues as to whether Purchaser might have), and Seller thereafter materially changed its position based upon the perceived repudiation/anticipatory breach—thus, as a matter of law: (1) it was too late for Purchaser to later retract the repudiation/anticipatory breach; (2) Seller was entitled to treat the PSA as breached and was relieved of its obligation to perform under the PSA; (3) Purchaser's later purported written termination of the PSA was ineffective (as there was no longer a live contract to terminate); and (d) Seller is entitled to collect the Earnest Money.

Viewing the summary judgment evidence in the light most favorable to Seller, the court has determined Purchaser is entitled to summary judgment as a matter of law and there is no need for a trial. Why? Because: (1) even if certain oral words were expressed by Purchaser to Seller exactly as has been described by Seller in its summary judgment evidence, such oral statements could not, as a matter of law, have constituted a repudiation and anticipatory breach of the PSA by Purchaser; but (2) even if a repudiation/anticipatory breach did occur (or even if

Seller has created a fact issue as to whether repudiation/anticipatory breach occurred), (a) Seller has not put forward credible evidence to create a fact issue that Seller may have materially changed its position in reliance on such repudiation/anticipatory breach, and thus (b) Purchaser was permitted to retract any alleged repudiation/anticipatory breach (which the undisputed facts indicate it did) and then terminate the PSA based upon Seller's contemplated bankruptcy filing, ultimately entitling Purchaser to collect the Earnest Money. This Memorandum Opinion and Order constitutes the court's reasoning, as contemplated by Fed. R. Civ. Proc. 56(a), as incorporated into this Adversary Proceeding by Fed. R. Bankr. Proc. 7056.

## II.    JURISDICTION

Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. § 1334. This is a statutory core proceeding, pursuant to 28 U.S.C. §157(b)(2)(A) and (O); thus, the bankruptcy court has statutory authority to enter a final order. Moreover, the court has determined that it has Constitutional authority to enter a final order in this matter, since the parties in this matter have both consented to entry of a final order by this court.[3] Finally, venue is proper before this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    THE UNDISPUTED SUMMARY JUDGMENT EVIDENCE[4]

The principal assets of Seller consisted of certain real property that constituted the Forest Park Medical Center of Dallas ("Forest Park Dallas"), which was located at 10290, 11990, and 11972 North Central Expressway, Dallas, Texas 75243 (the "Property").[5] The Property included

---

[3] *Wellness Intern. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015).

[4] Note that, in determining the merits of a motion for summary judgment, the court also has discretion to take judicial notice of all documents filed with this court. *See Goldberg v. Craig (In re Hydro-Action, Inc.)*, 341 B.R. 186, 188 (Bankr. E.D. Tex. 2006) (citing Fed. R. Evid. 201(b), (f)).

[5] *See* Seller App., Declaration of Todd Furniss, ¶ 1 [DE # 31 in the AP].

several hospital buildings, a parking garage, and a 3.786 acre vacant lot (the "Vacant Lot"). The Vacant Lot belonged solely to Seller and was not encumbered by a lien of Seller's secured lender.

### A. The PSA Between Seller and Purchaser.

Effective March 18, 2015, Seller and Purchaser entered into the PSA,[6] pursuant to which Seller agreed to sell and Purchaser agreed to buy the Vacant Lot.[7] The PSA provided that the purchase price for the Vacant Lot was $4.1 million[8] and that Purchaser would deposit earnest money in the amount of $50,000.00.[9]

Section 7 of the PSA contained the various warranties, representations and covenants of Seller to Purchaser and vice versa in connection with the sale of the Vacant Lot. In section 7.1.4 of the PSA, under the heading "Bankruptcy," Seller warranted and represented to Purchaser as follows:

> There are no attachments, executions, assignments for the benefit of creditors, *or voluntary or involuntary bankruptcy proceedings*, or proceedings under any debtor relief laws, *contemplated by or pending* or, to Seller's knowledge, threatened against Seller or the Property.[10]

Additionally, in section 7.2.2 of the PSA, under the heading "Authority," Purchaser warranted to Seller that:

---

[6] *See* Purchaser App., Purchase and Sale Agreement [DE # 14-1 in the AP].

[7] *See* Purchaser App., Declaration of Adam Lampert, ¶ 3 [DE # 14 in the AP].

[8] Specifically, § 3 of the PSA (defined "PURCHASE PRICE") provided that "The purchase price (the 'Purchase Price') for the Property will be Four Million One Hundred Thousand and No/100 Dollars ($4,100,000.00). The Purchase Price will be payable in cash, federal funds, cashier's or certified check, or other funds immediately available in Dallas, Texas, at Closing." *See* Purchaser App., Purchase and Sale Agreement, § 3 [DE # 14-1 in the AP].

[9] *See* Purchaser App., Purchase and Sale Agreement, §§ 3 & 4.1 [DE # 14-1 in the AP].

[10] *See* Purchaser App., Purchase and Sale Agreement, § 7.1.4 [DE # 14-1 in the AP] (emphasis added).

Purchaser has all the requisite power and authority, has taken all actions required by its organizational documents and applicable law, and has obtained all necessary consents, to execute and deliver this Agreement and to consummate the transactions contemplated in this Agreement. Each individual executing this Agreement on behalf of Purchaser represents and warrants to Seller that he is duly authorized to do so.[11]

Further, section 7.6 of the PSA, entitled "Conditions Precedent," provided that Purchaser's obligation to close was expressly conditioned, among other things, upon the continuing accuracy of Seller's representations and warranties on the Closing Date (including the representation and warranty that bankruptcy proceedings were not being contemplated by Seller), specifically stating, at Section 7.6.1, that "[e]ach of the representations and warranties *made by Seller* in this Agreement will be true and complete in all material respects on the Closing Date as if made on and as of such date." Further, to the extent Seller's representations and warranties were no longer true and complete, section 7.6 of the PSA set forth the following options for Purchaser:

> *In the event that all of the conditions precedent are not satisfied or waived in writing by the Closing Date*, and in addition to any other remedy Purchaser may have for the failure of such condition, *Purchaser may, at its option*, by written notice to Seller, either *(i) extend the Closing Date* for a reasonable period of time to allow Seller to satisfy any condition that is reasonably capable of being satisfied, or *(ii) terminate this Agreement and receive a return of the Earnest Money* free of any claims by Seller or any other party with respect thereto, and upon such termination, neither party shall have any further rights or obligations hereunder except for those provisions which expressly survive the termination of the Agreement.[12]

Similarly, section 7.4 of the PSA set forth Purchaser's "Remedies" in the event that any particular warranty and representation (including the representation and warranty that bankruptcy proceedings were not being contemplated) proved to be "untrue or incorrect in any material respect prior to Closing," stating:

---

[11] *See* Purchaser App., Purchase and Sale Agreement, § 7.2.2 [DE # 14-1 in the AP].

[12] *See* Purchaser App., Purchase and Sale Agreement, § 7.6 [DE # 14-1 in the AP] (emphasis added).

> ***If any of the foregoing warranties and representations proves to be untrue or incorrect*** in any material respect prior to Closing, ***Purchaser*** may either ***(i) terminate this Agreement by written notice delivered to Seller, in which event the Earnest Money will be promptly refunded to Purchaser***, and thereafter neither Seller nor Purchaser will have any further duties or obligations hereunder, except as otherwise expressly provided herein, or ***(ii) proceed to Closing***, thereby waiving any further claim as to such untruth or inaccuracy. The representations and warranties set forth in this <u>Section 7</u> will be true, accurate and correct in all material respects upon the execution of this Agreement and on and as of the Closing Date, and will survive Closing for a period of one (1) year.[13]

It is important to note that sections 7.1.4, 7.4, 7.6, and 7.6.1 of the PSA ***only*** applied to the representations and warranties made by Seller, and only provided remedies to Purchaser. These sections, however, were not the only "remedies" provisions included in the PSA. Specifically, Paragraph 9.1 of the PSA, entitled "Default by Seller," stated that:

> ***In the event that Seller fails to consummate this Agreement or if Seller fails to perform any of Seller's other obligations hereunder either prior to or at Closing***, and such failure or refusal results from any reason other than the termination of this Agreement by Purchaser pursuant to a right to terminate expressly set forth in this Agreement or Purchaser's failure to perform Purchaser's obligations under this Agreement, ***Purchaser may (i) terminate this Agreement by giving written notice thereof to Seller prior to or at Closing, in which event Purchaser will be entitled to a return of the Earnest Money*** and interest thereof free and clear of any claims by Seller, and thereafter, neither Seller nor Purchaser will have any further duties or obligations to the other hereunder, except as otherwise provided hereon; or ***(ii) enforce specific performance of Seller's duties and obligations under this Agreement***. As a condition precedent to filing an action for specific performance, Purchaser must deliver notice to Seller of its intention to file such action within sixty (60) days after the scheduled Closing and such action must be commenced within one hundred twenty (120) of the Scheduled Closing Date.[14]

Finally, the PSA also provided a remedy to Seller for a "Default by Purchaser," if Purchaser failed or refused to consummate the purchase of the Vacant Lot pursuant to the terms of the PSA. Specifically, section 9.2 of the PSA stated that:

---

[13] *See* Purchaser App., Purchase and Sale Agreement, § 7.4 [DE # 14-1 in the AP] (emphasis added).

[14] *See* Purchaser App., Purchase and Sale Agreement, § 9.1 [DE # 14-1 in the AP] (emphasis added).

> *In the event that Purchaser fails or refuses to consummate the purchase of the Property pursuant to this Agreement or if Purchaser fails to perform any of Purchaser's other obligations hereunder either prior to or at Closing*, and such failure or refusal results from any reason other than termination of this Agreement by Purchaser pursuant to a right to terminate expressly set forth in this Agreement or Seller's failure to perform Seller's obligations under this Agreement, *then Seller, as Seller's sole and exclusive remedy, will have the right to terminate this Agreement by giving written notice thereof to Purchaser prior to or at Closing*, whereupon neither party thereto will have any further rights or obligations hereunder *except that Purchaser will authorize the Title Company to pay to Seller as liquidated damages an amount equal to the sum of the Earnest Money* and interest thereon . . . .[15]

Also pertinent to this Adversary Proceeding, to the extent there was any future litigation regarding the terms and conditions of the PSA, section 9.3 of the PSA entitled "Legal Fees" stated that:

> In the event either party to this Agreement commences legal action of any kind to enforce the terms and conditions of this Agreement, *the prevailing party* in such litigation *will be entitled to collect from the other party all costs, expenses and attorney['s] fees* incurred in connection with such action.[16]

**B. The Time Line Leading up to Seller's Bankruptcy.**

*1. The Multiple Extensions of the Closing Date (with Multiple Escrow Deposits).* Under the terms of the PSA, the closing date for the sale of the Vacant Lot was to occur 30 days after the "Inspection Period" (as such term was defined in the PSA), or no later than August 17, 2015, if Purchaser exercised both a first and second option to extend the Inspection Period (the "Extension Options").[17] Purchaser exercised both Extension Options. However, effective July 16, 2015, Seller and Purchaser entered into an Amendment to Purchase and Sale Agreement (the "First Amendment").[18] Under the First Amendment, the parties added a third and fourth

---

[15] *See* Purchaser App., Purchase and Sale Agreement, § 9.2 [DE # 14-1 in the AP] (emphasis added).

[16] *See* Purchaser App., Purchase and Sale Agreement, § 9.3 [DE # 14-1 in the AP] (emphasis added).

[17] *See* Seller App., Declaration of Todd Furniss, ¶ 2 [DE # 31 in the AP].

[18] *See* Seller App., Declaration of Todd Furniss, ¶ 3 [DE # 31 in the AP].

Extension Option, and provided that the Closing Date would be October 16, 2015, if Purchaser exercised both the third and fourth Extension Options.[19] Purchaser again exercised both Extension Options. However, effective September 16, 2015, Seller and Purchaser entered into yet another amendment—*i.e.,* entitled Amendment No. 2 to Purchase and Sale Agreement (the "Second Amendment").[20] Under the Second Amendment, the parties added yet a fifth Extension Option to extend the Inspection Period and provided that the Closing Date would occur November 20, 2015, if Purchaser exercised this fifth Extension Option, which it did.[21] Under the PSA, the First Amendment, and the Second Amendment, the initial earnest money was $50,000.00, and Purchaser deposited additional earnest money each time it exercised an Extension Option to extend the Inspection Period as follows:

| Option | Additional Earnest Money |
|--------|--------------------------|
| 1 | $25,000.00 |
| 2 | $25,000.00 |
| 3 | $37,500.00 |
| 4 | $37,500.00 |
| 5 | $25,000.00 |

Thus, the amount of the Earnest Money eventually totaled $200,000.00.[22] Purchaser finally sent Seller a Notice of Intent to Proceed pursuant to section 6.4 of the PSA, on October 20, 2015, which resulted in a closing date of November 20, 2015.[23]

---

[19] *Id.*

[20] *See* Seller App., Declaration of Todd Furniss, ¶ 4 [DE # 31 in the AP].

[21] *Id.*

[22] *See* Seller App., Declaration of Todd Furniss, ¶ 5 & Seller App. at 35 [DE # 31 in the AP].

[23] *See* Seller App., Declaration of Todd Furniss, ¶ 5 [DE # 31 in the AP].

_2. The Oral Conversations "Around" November 10, 2015._  Seller asserts that "around November 10, 2015"—ten days before the scheduled November 20, 2015 closing date—there was a significant occurrence.  "[A]round November 10, 2015," there allegedly was an oral communication between some unidentified person on behalf of Purchaser and some unidentified person on behalf of Seller (to be clear, the summary judgment evidence does not identify whom the speakers were) wherein—according to a declaration submitted into the summary judgment evidence by Seller—the unidentified person indicated that Purchaser was "unable to close in accordance with the PSA due to a lack of funding and requested new [financing] terms."[24] Whatever the exact words may have been, and whomever the speakers were, **_it appears undisputed that Purchaser, around November 10, 2015, did at least request partial seller-financing from Seller, such that Purchaser would pay $2 million of the $4.1 million purchase price in cash and Seller might finance the remaining $2.1 million of the purchase price_**.[25]  It is undisputed that Seller's management submitted this proposal to Seller's limited partners, but the limited partners ultimately rejected the proposal.[26]  Further, it is undisputed that on November 20, 2015, while efforts were still ongoing to obtain the necessary consents from the limited partners, Purchaser and Seller entered into an agreement to extend the closing deadline (yet again—a sixth time) to **_November 30, 2015_**.[27]

_3. Seller's Oral Communication to Purchaser that it was Contemplating Bankruptcy._ November 30, 2015 fell on a Monday.  On or before the weekend prior to Monday, November

---

[24] _See_ Seller App., Declaration of Todd Furniss, ¶ 6 [DE # 31 in the AP].

[25] _Id._

[26] _Id._

[27] _See_ Seller App., Declaration of Todd Furniss, ¶ 7 [DE # 31 in the AP].

30, 2015, it is undisputed that Adam Lampert ("Mr. Lampert"), a member and manager of Purchaser, [28] was informed by Todd Furniss ("Mr. Furniss"), a representative of Seller, that Seller was contemplating and probably would be filing a voluntary bankruptcy petition on November 30, 2015. Seller's secured lender, Sabra Texas Holdings, L.P. ("Sabra"), had given notice that it would be conducting non-judicial foreclosure sales on Tuesday, December 1, 2015, with regard to certain *other* properties owned by Seller (not the Vacant Lot; recall the Vacant Lot was unencumbered).[29] It seemed that the Forest Park Medical Center of Dallas had been shuttered in the weeks before November 30, 2016 (specifically, Seller's tenant therein—an affiliate of Seller—had ceased operating and ceased paying rent to Seller) and Seller had been unable to service its debt to Sabra. Thus, Seller expected to file bankruptcy to stop Sabra's foreclosure sales.

 *4. The November 30, 2015 Emails Between Representatives of Purchaser and Seller.* On Monday, November 30, 2015, at 11:10 a.m., Purchaser's manager Mr. Lampert sent an email to George Guszcza ("Mr. Guszcza"), another individual who was a representative of Seller, attaching an unsigned document that purported to extend the closing deadline under the PSA (yet again) to January 29, 2016 (the "January 29 Extension").[30] Mr. Lampert's email stated: "George: See attached extension. Please execute and return asap. Thank you!"[31] In response, six minutes later, at 11:16 a.m., Mr. Guszcza sent an email to his colleague Mr. Furniss (attaching the January 29 Extension), stating "Todd, Please see the attached closing extension to Jan 29,

---

[28] *See* Purchaser App., Declaration of Adam Lampert, ¶ 2 [DE # 14 in the AP].

[29] *See* Purchaser App., Declaration of Adam Lampert, ¶ 5 [DE # 14 in the AP].

[30] *See* Seller App. at 36-37.

[31] *See* Seller App at 36.

2016 for your signature."[32] **_Then there was two hours of silence_**.  It is undisputed that, after this

two hours of silence, at 1:14 p.m. on the same day, November 30, 2015, Mr. Lampert sent an

email to Mr. Furniss with an attached document purporting to **_terminate_** the PSA (the

"Termination Notice").[33]  The cover email stated that:

> Todd:
>
> As we do not have an extension of our Agreement in place, I am delivering the attached Notice of Termination pursuant to our Agreement which requires action by 2pm today.
>
> While the attached Notice of Termination terminates the current Agreement, we **_remain committed to closing this transaction with you_**. If you are able to obtain the consents from your LPs, I would be most inclined to complete this transaction today (on the terms negotiated) ahead of your bankruptcy filing.
>
> At your earliest convenience, please call me to discuss the terms of an amendment to our current Agreement that would contemplate the pending bankruptcy proceeding . . . .[34]

The attached Termination Notice was signed by Mr. Lampert, as President of Purchaser, and

provided that it was being sent "VIA FAX, EMAIL AND OVERNIGHT DELIVERY TO ALL

REC[I]PIENTS" (including the general partner of Seller).  The Termination Notice read as

follows:

> As you are aware, Seller has advised Purchaser of its intention to file for Chapter 11 bankruptcy protection.  Such intention constitutes a breach by Seller of Section 7.1.4 of the Agreement.  Consequently, pursuant to section 7.4 of the Agreement, this letter will confirm and advise you of the termination of the Agreement by [Purchaser], effective immediately.  Purchaser hereby demands and instructs the Seller and, by copy of this letter, the Title Company to immediately refund and return to Purchaser all amounts constituting Earnest Money under the Agreement.[35]

---

[32] *Id.*

[33] *See* Seller App. at 38-39.

[34] *See* Seller App. at 38 (emphasis added).

[35] *See* Seller App. at 39.

Then, some 43 minutes later, at 1:57 p.m. on November 30, 2015—*without there being any mention of the Termination Notice*—Mr. Guszcza sent an email to Mr. Lampert and Mr. Furniss with a copy of the January 29 Extension executed by Mr. Furniss attached.[36] *The January 29 Extension not only arrived 43 minutes after the purported termination of the PSA by Purchaser, but it was never executed by Mr. Lampert or anyone on behalf of Purchaser*.

More than three hours later, at 5:10 p.m. on November 30, 2015, Mr. Lampert sent another email to Messrs. Guszcza and Furniss stating:

Todd:

Did you file for bankruptcy today?

I've talked to my team and we are willing to do whatever is necessary to finish the documents that are required to close the deal today. The Title company has told us that they would support us if we felt we could get the deal done tonight and funded in the morning (ahead of a bankruptcy filing and ahead of any foreclosure). My $2mm is ready to b[e] wired, and I believe that we can figure out a way to pay part of the remaining amount ($2.1mm) ahead of the contemplated window.

I think all the parties would benefit by completing this deal ahead of a bankruptcy filing. Obviously, the missing element is the consents. I'm hopeful that if you communicate to your partners the fact that the escrow has been forfeited and that the bankruptcy proceeding will probably decrease the value of the property (if subjected to a bid process) that perhaps they will see the great benefit of consenting to our deal today!

Please let me know if I can help . . . .[37]

*C. Seller Files for Bankruptcy and Purchaser Files the Adversary Proceeding.*

Twelve minutes later, at 5:22 p.m. on November 30, 2015, Seller filed for bankruptcy.[38]

Seller never pursued, much less sought leave of the Bankruptcy Court to consummate a sale of

---

[36] *See* Seller App. at 40-42.

[37] *See* Seller App. at 43.

[38] *See* DE # 1 in the BK Case. Note that references to "DE # __ in the BK Case" throughout this Opinion refer to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Clerk in the above-referenced bankruptcy case (the "Bankruptcy Case").

the Vacant Lot to Purchaser on or before January 29, 2016.[39]  The Vacant Lot was ultimately sold (along with substantially all of Seller's property) to Columbia Hospital at Medical City Dallas Subsidiary, L.P. with the approval of the Bankruptcy Court on June 16, 2016.[40]

Purchaser filed the Adversary Proceeding on March 30, 2016.  In its Original Complaint,[41] Purchaser asserted various causes of action against Seller including, first, a declaratory judgment under 28 U.S.C. §§ 2201, *et seq.*, and Tex. Civ. Prac. & Rem. Code  §§ 37.001, *et seq.*, that (1) Seller, by its contemplated bankruptcy case, gave Purchaser the right to terminate the PSA; (2) Purchaser did terminate the PSA in accordance with its terms and was entitled to the Earnest Money, together with interest thereon, under the provisions of the PSA; (3) Purchaser's right to the Earnest Money was free and clear of any claims by Seller; (4) Seller did not exercise any right to terminate the PSA, and, therefore, failed to trigger any claim to the Earnest Money; (5) Seller's delivery of the January 29 Extension, after Purchaser's delivery of the Termination Notice, was not valid to unilaterally extend the PSA; (6) Seller's delivery of the January 29 Extension, after Purchaser's delivery of the Termination Notice, constituted conduct inconsistent with any belief by Seller that Purchaser had earlier anticipatorily breached the PSA, and thus constituted a waiver of any right to terminate the PSA or make any claim against the Earnest Money; (7) if Seller's delivery of the January 29 Extension, after Purchaser's delivery of the Termination Notice, was, arguendo, a valid extension of the PSA, Seller's failure to attempt to close, or seek leave of the Bankruptcy Court to do so, prior to January 29, 2016, was a default by Seller under the PSA, for which Purchaser is entitled to the return of the Earnest Money; (8)

---

[39] *See* Seller App., Declaration of Todd Furniss, ¶ 9 [DE # 31 in the AP].  *See also* Purchaser App., Declaration of Adam Lampert, ¶ 6 [DE # 14 in the AP].  *See also* Bankruptcy Case Docket Sheet.

[40] *See* DE # 133 in the BK Case.

[41] *See* DE # 1 in the AP.

Purchaser is entitled to the Earnest Money, plus interest thereon; (9) Seller's continuing assertion of a claim against the Earnest Money is itself a breach of the PSA; (10) section 9.3 of the PSA, Tex. Civ. Prac. & Rem. Code §§ 38.001, *et seq.*, and Tex. Civ. Prac. & Rem. Code § 37.009 entitle Purchaser to recover reasonable attorney's fees, costs and expenses from Seller or as this court determines to be equitable and just; and (11) Purchaser is entitled to an award of attorney's fees, costs and expenses and such amounts should be accorded administrative expense status under sections 503(b) and 507 of the Bankruptcy Code. Finally, Purchaser asserted a breach of contract claim against Seller, arguing that Seller breached the PSA by its unfounded assertion of a claim to the Earnest Money and that Purchaser is entitled to the Earnest Money, with interest and attorney's fees.

In response, Seller filed various affirmative defenses and counterclaims against Purchaser. [42] As to the affirmative defenses, Seller asserted that Purchaser's claims are barred by: (1) Purchaser's anticipatory breach of the PSA; (2) failure of consideration; and (3) repudiation. As to the counterclaims, Seller filed various counterclaims against Purchaser including: (1) breach of contract; (2) declaratory relief that Seller is entitled to the Earnest Money; (3) turnover of property of the estate (*i.e.*, the Earnest Money); and (4) attorney's fees. With regard to the breach of contract counterclaim, Seller has argued (once again—similar to its arguments in its affirmative defenses) that, when Purchaser informed Seller of its inability to close under the PSA (orally, "around November 10, 2015"), Purchaser committed an anticipatory breach of the PSA, and at that point, if not sooner, the Earnest Money was no longer refundable. Moreover, Seller has argued that it materially changed its position in reliance on the alleged repudiation/anticipatory breach. As a result, Purchaser allegedly lost its right to retract its

---

[42] *See* DE # 5 in the AP.

repudiation and, because Purchaser repudiated the PSA, Seller argues that it was discharged of its obligations under the PSA, including any alleged obligation not to file bankruptcy. Accordingly, Seller believes it is entitled to a judgment in its favor, allowing it to recover the Earnest Money.  Purchaser has also pleaded certain special and affirmative defenses to Seller's counterclaims including that Seller's claims are barred under the provisions of the PSA as well as waiver, estoppel, and election of remedies.[43]

## IV.  SUMMARY JUDGMENT STANDARD

On July 28, 2016, Purchaser filed the Motion for Summary Judgment that is now before the court, requesting this court to rule as a matter of law that Purchaser is entitled to recover the Earnest Money under the terms of the PSA and that Seller's counterclaims and affirmative defenses ultimately fail.  Summary judgment is appropriate whenever a movant establishes that the pleadings, affidavits, and other evidence available to the court demonstrate that no genuine issue of material fact exists, and the movant is, thus, entitled to judgment as a matter of law.[44]  A genuine issue of material fact is present when the evidence is such that a reasonable fact finder could return a verdict for the non-movant.[45]  Material issues are those that could affect the outcome of the action.[46]  The court must view all evidence in a light most favorable to the non-moving party, Seller, and summary judgment is only appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's

---

[43] *See* DE # 11 in the AP.

[44] FED. R. CIV. P. 56(a); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006); *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D. Tex. 2004).

[45] *Piazza's Seafood World, LLC*, 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[46] *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).

case."[47]  Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[48]  If the movant satisfies its burden, the non-movant must then come forward with *specific* evidence to show that there is a genuine issue of fact.[49]  The non-movant may not merely rely on ***conclusory allegations or the pleadings***.[50]  Rather, it must demonstrate ***specific facts*** identifying a genuine issue to be tried in order to avoid summary judgment.[51]  The Fifth Circuit has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the non-movant's burden in a motion for summary judgment."[52]  By way of example, the Fifth Circuit held in *Wallace v. Texas Tech University*, 80 F.3d 1042, 1048 (5th Cir. 1996), that an African-American assistant men's basketball coach's vague and conclusory statement that "African-American players were referred to and addressed with hostile and profane language whereas white players did not receive such treatment," failed to designate ***specific facts***, such as ***what was said, to whom it was said, or even who made comments***, and was insufficient to avoid summary judgment for head coach in assistant

---

[47] *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891 & *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[48] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[49] *Lockett*, 337 F. Supp. 2d at 891; *see also Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993) (emphasis added).

[50] *Lockett*, 337 F. Supp. 2d at 891 (emphasis added).

[51] FED. R. CIV. P. 56(c)(1); *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891 (emphasis added).

[52] *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (quoting *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc)).

basketball coach's employment discrimination claim based on head coach's refusal to renew his contract.

## V.     LEGAL ANALYSIS

As stated above, the Motion for Summary Judgment asks this court to rule, as a matter of law, that Purchaser is entitled to a refund of the Earnest Money under the PSA.  The essence of Purchaser's argument is that, under the clear and unambiguous terms of the PSA:  (1) it had the right to—and under the undisputed facts *did*—terminate the PSA on November 30, 2015, in writing, a few hours before Seller filed bankruptcy, citing Seller's contemplation of filing for bankruptcy (which was a failure of a representation and warranty of Seller in the PSA); (2) such written termination entitled Purchaser to a refund of the Earnest Money; and, (3) there is no genuine issue of disputed fact that requires a trial.  It is a simple matter of reading, in concert, sections 7.1.4, 7.4, and 7.6 of the PSA.  To be clear, if any of the warranties and representations of Seller proved to be untrue or incorrect *in any material respect prior to Closing* (including the representation and warranty that it was not contemplating bankruptcy), then Purchaser had the absolute right to terminate the PSA and get its Earnest Money back.  In response, Seller has argued that Purchaser repudiated and anticipatorily breached the PSA—with the oral conversation that occurred "around November 10, 2015," wherein an unidentified person on behalf of Purchaser communicated to an unidentified person on behalf of Seller that Purchaser allegedly would be unable to fund the $4.1 million purchase price and requested new financing terms from Seller.  Since this alleged repudiation and anticipatory breach occurred *prior* to Purchaser sending the November 30, 2015 Termination Notice, Seller has argued that such repudiation and anticipatory breach meant there was no live contract to terminate and also meant

that Seller was relieved of any further obligations under the PSA—under basic contract law principles—including the obligation not to contemplate bankruptcy.

### A.  Examining the PSA.

The court must first examine the specific provisions of the PSA that pertain to obligations, breaches and remedies to determine if they dictate a result in this Adversary Proceeding and preclude the need for trial.  To the extent the terms of the PSA are not clear or do not otherwise dictate a result in this Adversary Proceeding, the court will next consult basic contract principles to see if they dictate a result in this Adversary Proceeding that will preclude the need for trial.

The primary concern of a court in construing a written contract is to ascertain the true intentions of the parties as expressed *in the instrument*.[53]  Thus, courts should examine the "unambiguous language in a contract" and enforce "'the objective intent' evidenced by the language used."[54]  "[C]ourts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."[55]  Whether a contract is ambiguous is a question of law for the court to decide.[56]  A contract is ambiguous when its meaning is *uncertain* and *doubtful* or is reasonably susceptible to more than one interpretation.[57]  However, if a contract is worded in such a manner that it can

---

[53] *Frew v. Janek*, 780 F.3d 320, 327-28 (5th Cir. 2015) (citing *Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (emphasis added)).

[54] *Janek*, 780 F.3d at 328 (citing *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996)).

[55] *Janek*, 780 F.3d at 328 (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).

[56] *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996) (citing *Nat'l Union Fire Ins. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *Coker*, 650 S.W.2d at 394)).

[57] *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (emphasis added).

-20-

be given a ***definite*** or ***certain*** legal meaning, then it is not ambiguous.[58]  An unambiguous

contract will be enforced as written, and parol evidence will not be received for the purpose of

creating an ambiguity or to give the contract a meaning different from that which its language

imports.[59]

      Contract interpretation is a matter of state law.[60]  Section 15.6 of the PSA states that it

will be construed under and governed by the laws of Texas; thus, the court will apply Texas law,

as necessary, in interpreting the PSA.

      The court first concludes that the PSA is clear and unambiguous, at section 7.1.4,

where—under the subheading "Bankruptcy"—Seller warranted and represented to Purchaser that

***there were no bankruptcy proceedings contemplated by it***.  Second, the PSA was also clear and

unambiguous at, sections 7.6 and 7.6.1, where—under the subheading "Conditions Precedent"—

it was specified that ***Purchaser's obligation to close*** was ***expressly conditioned on the***

***continuing accuracy*** of the warranty and representation that ***there were no bankruptcy***

***proceedings contemplated by Seller***.  Third, the PSA was further clear and unambiguous, at

section 7.4, where—under the subheading "Remedies"—it was specified that, if the

representation and warranty that bankruptcy proceedings were not being contemplated proved to

be "untrue or incorrect in any material respect prior to Closing," that ***Purchaser had the option***

***to terminate the PSA*** "by written notice delivered to Seller, in which event the Earnest Money

will be promptly refunded to Purchaser."  The court concludes that Purchaser had the clear and

---

[58] *Friendswood Dev. Co.*, 926 S.W.2d at 282 (emphasis added) (citing *Nat'l Union Fire Ins.*, 907 S.W.2d at 520)).

[59] *Heritage Res., Inc.*, 939 S.W.2d at 121 & *David J. Sacks, P. C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008).  *See also Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951).

[60] *Power Lift, Inc. v. Weatherford Nipple–Up Sys., Inc.*, 871 F.2d 1082, 1085 (Fed. Cir. 1989).

unequivocal right to terminate the PSA when it did, on November 30, 2015, and recover the Earnest Money upon having learned that Seller was contemplating bankruptcy.  There is nothing ambiguous about this contract language and the court is required to enforce such language as written.  It is undisputed that Seller (through Mr. Furniss) advised Purchaser (through Mr. Lampert) that it intended to file bankruptcy, to avoid a scheduled December 1, 2015 foreclosure on certain of its property, and that Seller **_did_** file bankruptcy on November 30, 2015—just after 5:00 p.m.

However, as previously stated, Seller has argued that, before Purchaser's written Termination Notice was delivered on November 30, 2015, Purchaser—in oral communications—effectively **_repudiated and anticipatorily breached_** the PSA (thereby excusing Seller from its own future obligations under the PSA and essentially rendering the PSA incapable of termination by Purchaser).  In other words, Seller essentially takes the position that Purchaser's repudiation and anticipatory breach precluded its ability to terminate the PSA due to Seller's contemplation of bankruptcy and, thus, Purchaser no longer had the right to return of the Earnest Money.  Specifically, Seller (through the declaration of Mr. Furniss) contends that "around November 10, 2015," an unidentified Purchaser-representative "advised [an unidentified Seller-representative] that it was unable to close in accordance with the PSA due to a lack of funding and requested new terms."  This—according to Seller—amounted to repudiation and anticipatory breach of the PSA.

The PSA itself does not specifically ever discuss "repudiation" and "anticipatory breach" _per se_.  Thus, the court must consult Texas state law on these contract principles to determine if Seller might have raised a fact issue that requires a trial in this Adversary Proceeding.  The case law in Texas seems to treat the terms "repudiation" and "anticipatory breach" essentially

synonymously. Jurisprudence in Texas consistently has stated that a repudiation or anticipatory breach occurs when a party's conduct shows a ***fixed intention to abandon, renounce, and refuse to perform the contract*** and that a repudiation of a contract must be ***absolute and unconditional***.[61] Case law has sometimes articulated three elements for establishing repudiation: (1) a party to the contract has absolutely repudiated an obligation thereunder; (2) without just excuse; and (3) the other party (*i.e.,* the party claiming repudiation) was damaged as a result.[62] The non-repudiating party then has the right to pursue several different courses of conduct: (a) treat the repudiation as a total breach of contract and sue for damages; (b) materially change its position in reliance on the repudiation; (c) indicate to the other party that it considered the repudiation to be final; or (d) do nothing and await the contractual time of performance.[63] Case law also addresses an ability on the part of a repudiating party to ***retract or nullify*** its repudiation but, if the non-repudiating party follows one of the first three courses of action (*i.e.,* options (a)– (c)), the repudiating party's right to retract or nullify its repudiation ends.[64] To be clear, if the non-repudiating party materially changes its position in reliance on the repudiation—as Seller asserts that it did—it would be too late for Purchaser to later retract or nullify its repudiation and treat the contract as still live.

---

[61] *Hunter v. Pricekubecka*, 339 S.W.3d 795, 802 (Tex. App.—Dallas 2011, no pet.) (emphasis added) & *Moore v. Jenkins*, 109 Tex. 461, 464-65 (Tex. 1919) (emphasis added).

[62] *Berg v. Wilson*, 353 S.W.3d 166, 174 n.11 (Tex. App.—Texarkana 2011, pet. denied) (citing *Pollack v. Pollack*, 39 S.W.2d 853, 855 (Tex. Comm'n App. 1931, holding approved) & *Hauglum v. Durst*, 769 S.W.2d 646, 651 (Tex. App.—Corpus Christi 1989, no writ)).

[63] *Glass v. Anderson*, 596 S.W.2d 507, 510 (Tex. 1980).

[64] *Id.*

**B. The Undisputed Summary Judgment Evidence Pertaining to Purchaser's Alleged Repudiation/Anticipatory Breach.**

Preliminarily, there are some deficiencies with the summary judgment evidence that Seller has presented to the court with respect to the repudiation/anticipatory breach argument. First, the actual human beings that allegedly orally communicated "around November 10, 2015" are not even identified by Seller. This is worse than hearsay—it is hearsay of an undisclosed person. Moreover, there is a lack of specificity as to **when** the oral conversation between the unidentified people occurred—only "around November 10, 2015." To overcome summary judgment, a non-movant (*i.e.*, Seller) is required to designate "specific facts beyond the pleadings that prove the existence of a genuine issue."[65] Has Seller really introduced into the summary judgement record specific enough evidence to create a fact issue? This court thinks not.

But—even assuming that Seller has been specific enough, in alleging that a Purchaser-representative orally told a Seller-representative "around November 10, 2015" that Seller "was unable to close in accordance with the PSA due to a lack of funding and requested new terms" (and accepting Seller's declaration at face value that this is **exactly** how the conversation occurred)—was this enough, as a matter of law, to constitute an "absolute and unconditional refusal to perform" or a "fixed intention to abandon, renounce, and refuse to perform"[66] the PSA? Again, this court thinks not. A repudiation or anticipatory breach must be expressed with

---

[65] *Narvaez v. Wilshire Credit Corp.*, 757 F. Supp. 2d 621, 626 (Bankr. N.D. Tex. 2010). *See also Wallace v. Tex. Tech University*, 80 F.3d 1042, 1048 (5th Cir. 1996) (the Fifth Circuit held that an African-American assistant men's basketball coach's vague and conclusory statement that "African-American players were referred to and addressed with hostile and profane language whereas white players did not receive such treatment" failed to designate specific facts, such as what was said, to whom it was said, or even who made comments, and was insufficient to avoid summary judgment for head coach in assistant basketball coach's employment discrimination claim based on head coach's refusal to renew his contract).

[66] *Hunter*, 339 S.W.3d at 802.

"positive and unconditional terms."[67]  The court does not believe any reasonable fact finder

could conclude that the alleged oral communication, around November 10, 2015, could be

construed as a "take it or leave it" unequivocal refusal to perform on the part of Purchaser, nor a

renouncing of the PSA.  It appears, at worst, the statements might be construed as an attempt to

get partial owner-financing from Seller, with an implication that Purchaser might not be able to

timely close without it, not a fixed intention to completely abandon the PSA.  Moreover, any

interpretation of the November 10, 2015 communication as an express refusal to perform would

seem contrary to Purchaser's conduct thereafter—namely, Purchaser's November 30, 2015 email

at 11:10 a.m., requesting another extension of the PSA.  To further illustrate this, the court

believes a summary of the facts in *Narvaez v. Wilshire Credit Corp.*, 757 F. Supp. 2d 621 (N.D.

Tex. 2010) (J. B. Lynn) would be helpful.

 *Narvaez* involved a dispute between Plaintiff Gerardo Narvaez, Jr. ("Narvaez") and the

current servicer and owner of the note and deed of trust on his home (collectively, the

"Defendants").  Narvaez defaulted on his mortgage in mid-2009, apparently due to a violent

attack that occurred at Narvaez's home on July 1, 2009.  In September and October of 2009,

Narvaez claimed that he had several phone conversations with Defendants' representatives,

during which he offered to make additional payments to eventually become current on his loan.

Narvaez claimed that the Defendants ***refused to accept these payments*** and told Narvaez that ***his***

***only option was a loan modification***.  Narvaez claimed that he received a loan modification

application from the Defendants, which he completed and submitted, but never received a

response.  In October 2009, Narvaez sent a payment for less than the amount due, and the

Defendants returned it.  Narvaez claimed that after his payment was returned, he called the

---

[67] *Narvaez*, 757 F. Supp. 2d at 631.

Defendants and asked for the amount he needed to pay to cure his defaults, but that the

Defendants refused to provide that information.  Narvaez received a notice of acceleration on

November 4, 2009.  He then received a notice that the acceleration was being rescinded so he

could cure the default.  He did not cure the default.  This happened again in December 2009.  At

some point, Defendants began the process to foreclose on Narvaez's home.  On December 30,

2009, Narvaez filed suit against the Defendants for wrongful foreclosure, breach of contract, and

related claims. The lawsuit was removed to the federal district court and eventually found itself

before Judge Barbara Lynn on Defendants' motion for summary judgment.  In that context,

Judge Lynn considered, among other things, whether the Defendants had anticipatorily

repudiated the contracts with Narvaez (*i.e.,* the note and deed of trust) by ***allegedly repudiating***

***an obligation under the deed of trust to reinstate Narvaez's loan after acceleration if certain***

***conditions were met***.  ***Defendants had allegedly stated that Narvaez's only option was to try to***

***get a loan modification.***[68]

Judge Lynn wrote that "an anticipatory repudiation of a contract may consist of either

words or actions by a party to a contract that indicate an intention that he or she is not going to

perform the contract according to its terms."[69]   "The declaration of intent to abandon the

obligation must be in positive and unconditional terms."[70]   Here, Judge Lynn held that "none of

Defendants' words or actions positively and unconditionally demonstrated an intent to abandon

their obligations under the deed of trust . . . . [Narvaez] alleges no facts from which the Court

could reasonably infer that Defendants' statement was an express refusal to perform their

---

[68] *Id.* at 624-25.

[69] *Id.* at 631.

[70] *Id.*

obligations, rather than a misunderstanding of the facts."[71]  Judge Lynn stated that "[s]uch an interpretation is contrary to the notice of default [the Defendant sent], which demanded full payment."  Thus, even when viewed in the light most favorable to Narvaez, "the facts demonstrate at worst that Defendants gave **_conflicting messages_** to [Narveaz] regarding the status of his loan.  Such confusion falls short of the positive and unconditional repudiation necessary to maintain a cause of action for anticipatory breach."[72]  Thus, the court granted summary judgment for the Defendants on Narvaez's anticipatory breach of contract claim.[73]

Like the communications in _Narvaez_, Purchaser's communications to Seller "around November 10, 2015"—even if they were articulated precisely as Mr. Furniss's declaration indicated—at worst, when viewed in the light most favorable to Seller, gave confusing messages regarding Purchaser's intent.  Such confusion, as a matter of law, falls short of the "positive and unconditional repudiation" necessary to establish an anticipatory breach of the PSA.[74]

However, even if Seller has put forth summary judgment evidence from which a fact finder might infer that Purchaser repudiated the PSA on November 10, 2015, the court still believes that Purchaser is entitled to return of the Earnest Money as a matter of law.  Why?  Because the undisputed summary judgment evidence was that Seller never gave any written

---

[71] _Id._ at 632.

[72] _Id._

[73] _Narvaez v. Wilshire Credit Corp._, 757 F. Supp. 2d 621, 624-25, 630-32 (N.D. Tex. 2010)

[74] _See also Ringel & Meyer, Inc. v. Falstaff Brewing Corp._, 511 F.2d 659, 660-61 (5th Cir. 1975) (in applying Louisiana law to a breach of contract dispute where one party asserted anticipatory breach based upon "obvious incapability of performance" because of financial distress, the Fifth Circuit noted that "so far as we know, no court, common-law or civil, has yet held that obvious incapability of performance due to financial difficulties constitutes anticipatory breach.").

notice that it considered Seller's oral communications around November 10, 2015 to be a repudiation/anticipatory breach, nor that it was terminating the PSA. Why is this significant? Because Section 9.2 of the PSA provided Seller with a clear and unambiguous remedy if Purchaser was unable to perform its obligations, which was to terminate the PSA by giving written notice to Purchaser prior to closing and Seller would then be entitled to collect the Earnest Money as damages. Specifically, section 9.2 of the PSA stated that:

> ***In the event that Purchaser fails or refuses to consummate the purchase of the Property pursuant to this Agreement or if Purchaser fails to perform any of Purchaser's other obligations hereunder either prior to or at Closing***, and such failure or refusal results from any reason other than termination of this Agreement by Purchaser pursuant to a right to terminate expressly set forth in this Agreement or Seller's failure to perform Seller's obligations under this Agreement, ***then Seller, as Seller's sole and exclusive remedy, will have the right to terminate this Agreement by giving written notice thereof to Purchaser prior to Closing***, whereupon neither party thereto will have any further rights or obligations hereunder ***except that Purchaser will authorize the Title Company to pay to Seller as liquidated damages an amount equal to the sum of the Earnest Money*** and interest thereon . . . .[75]

It is undisputed that Seller never sent a notice of termination to Purchaser and that Seller chose not to exercise its "sole and exclusive" contractual remedy. There is no suggestion or hint anywhere in the summary judgment evidence that Seller gave any indication that it considered Purchaser to have repudiated or anticipatorily breached the PSA based upon Purchaser's request for partial owner-financing on the Vacant Lot.

While the PSA provided a clear and exclusive remedy for Seller, to the extent it believed that Purchaser had anticipatorily breached the PSA, Seller has, nonetheless, argued that under contract law principles, a seller cannot, by its own words or action or inaction, essentially waive its right to assert a breach of contract claim. As previously stated, this ignores the unambiguous

---

[75] *See* Purchaser App., Purchase and Sale Agreement, § 9.2 [DE # 14-1 in the AP] (emphasis added).

contract language in Section 9.2 of the PSA. However, even if the PSA was somehow ambiguous on this point, Seller ignores the fact that Purchaser's breach, if any, with its November 10, 2015 oral communication, would have only been an anticipatory breach (since occurring before the time for performance was due)—not an actual breach. As previously mentioned, contract law provides that Seller, in the face of a repudiation/anticipatory breach, could have pursued several courses of action. Seller could have: (1) treated the anticipatory breach as a total breach of contract and sued for its damages; (2) materially changed its position in reliance on the repudiation; (3) indicated to Purchaser that it considered the repudiation to be final; or (4) done nothing and awaited the contractual time of performance.[76] The undisputed summary judgment evidence seems quite clear that Seller did nothing. Seller has argued that it materially changed its position in reliance on Purchaser's alleged repudiation—specifically, that it had no choice but to file bankruptcy, based upon Purchaser's inability to close on the sale of the Vacant Lot on November 30, 2015. But, there is no summary judgment evidence in the record to create a legitimate fact issue that Seller materially changed its position in reliance on Purchaser's alleged repudiation. Rather, Seller merely submits Mr. Furniss's declaration which states:

> [Seller's] principal secured creditor, with senior liens against the Property, was Sabra Texas Holdings, L.P. ("Sabra"). ***Because Forest Park Dallas was shuttered before November 30, and [Seller's] tenant at the Property was therefore not paying rent, [Seller] had been unable to service its debt to Sabra***. If [Purchaser] had been able to close under the PSA by November 30 instead of requesting a modification of the PSA's terms on or about November 10, [Seller] would have been able to continue servicing its debt to Sabra. Instead, because [Purchaser] was unable to close under the PSA, [Seller] had no choice but to file bankruptcy to protect the Property, and [Seller] ultimately had to pay Sabra approximately $7.8 million more in interest, no less than $2.5 million of which was default interest.[77]

---

[76] *Glass v. Anderson*, 596 S.W.2d at 510.

[77] *See* Seller App., Declaration of Todd Furniss, ¶ 10 [DE # 31 in the AP] (emphasis added).

What does this evidence demonstrate?  Seller was in default with its lender Sabra—which did not hold liens on the Vacant Lot—and the suggestion is that Seller might not have had to file bankruptcy on November 30, 2015 if Purchaser had closed the deal under the original terms that day.  But it is undisputed that Seller defaulted with Sabra before November 30, 2015 because Seller's only source of revenue (its tenant hospital operator—which happened to be an affiliate of Seller) had closed down and stopped paying Seller rent to enable Seller to service Sabra's $100 million debt.  The innuendo that Seller materially changed its position after November 10, 2015, by deciding to file for bankruptcy—all because of Purchaser's request for new financing— falls short of establishing a credible fact issue for trial.  Rather, the undisputed summary judgment evidence demonstrates that Seller took option number four (above) in response to Purchaser's anticipatory breach: do nothing and wait for the contractual time of performance.

Why does it matter that, according to the undisputed facts, Seller took the "do nothing and wait option"—again, giving Seller every benefit of the doubt that Purchaser's November 10, 2015 oral communication constituted a repudiation and anticipatory breach?  Because, again, not only did section 9.2 of the PSA dictate that Seller's sole and exclusive option was to give written notice of termination, but contract law provides that a party that commits an anticipatory breach can *retract* its statements and thereby *nullify* the anticipatory breach if the breaching party notifies the other party before the other party materially changes its position in reliance on the repudiation or before the other party indicates that it considers the repudiation final.[78]

Based on the undisputed summary judgment evidence, Purchaser sent an email at 11:10 a.m. on November 30, 2015, before Seller filed bankruptcy, seeking an extension of the time to

---

[78] *Glass v. Anderson*, 596 S.W.2d at 512-513.

close under the PSA. Viewing this evidence in the light most favorable to Seller, ***any reasonable fact finder would have to conclude that Purchaser was retracting or nullifying any oral statement it made on November 10, 2015 that may have expressed a fixed intention to abandon the PSA***.[79] Thus, this court concludes there is nothing in the summary judgment record to suggest that a genuine issue of material fact exists as to whether the PSA was still a live agreement at 1:14 p.m. on November 30, 2015, when Purchaser sent the Termination Notice. To be clear, at that point: (1) it is undisputed that Seller had never given a written notice of termination; and (2) any repudiation by Purchaser that may have arguably occurred with its oral words around November 10, 2015 can only be assumed to have been retracted by its words and conduct on November 30, 2015 at 11:10 am, which suggested an interest in still purchasing the Vacant Lot.

This brings the analysis full circle and back once again to the one and only Termination Notice that indisputably exists in this case.[80] This court finds that summary judgment should be granted in favor of Purchaser and that it is entitled to the Earnest Money currently being held in the registry of the court. Accordingly, the court will enter a declaratory judgment pursuant to 28

---

[79] *See also Kilgore v. N.W. Tex. Bap. Educ. Soc.*, 90 Tex. 139, 143 (Tex. 1896) (Texas Supreme Court held that "a mere assertion that the party will be unable or will refuse to perform his contract is not sufficient. It must be distinct and unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made; for, if he afterwards continue[s] to urge or demand compliance with the contract, it is plain that he does not understand it to be at an end.").

[80] At the hearing on the Motion for Summary Judgment, Seller raised (for the first time) that the Termination Notice was not effective in that it was only sent to Seller via email (*See* Seller App. at 38-39) rather than by the means prescribed in section 12 of the PSA which required notices to be sent by "United States certified or registered mail, postage fully prepaid, return receipt requested, or by Federal Express . . . or by facsimile with a confirmation copy delivered by a nationally recognized overnight courier service." *See* Purchaser App., Purchase and Sale Agreement, § 12.2 [DE # 14-1 in the AP]. However, there was no summary judgment evidence submitted by Seller which would raise a genuine fact issue that the Termination Notice was only transmitted via email. In fact, when looking at the actual Termination Notice, it provides at the top that it was sent "VIA FAX, EMAIL, AND OVERNIGHT DELIVERY TO ALL REC[I]PIENTS." Accordingly, the court concludes that there is nothing in the summary judgment record to create a fact issue as to whether the Termination Notice was effective and terminated the PSA.

U.S.C. §§ 2201, *et seq.*, and Tex. Civ. Prac. & Rem. Code §§ 37.001, *et seq.* that: (1) Seller, by its communication that it was contemplating a bankruptcy case, committed a breach of a warranty and representation that it had made, and gave rise to a failure of a condition precedent to closing, which gave Purchaser the right to terminate the PSA; (2) Purchaser properly, unequivocally and unambiguously terminated the PSA in accordance with its terms, and therefore became entitled to the Earnest Money, together with interest thereon, under the provisions of the PSA; (3) Purchaser's right to the Earnest Money is free and clear of any claims by Seller; (4) Seller did not exercise any right to terminate the PSA, and therefore failed to trigger any right to the Earnest Money for itself; (5) Seller's delivery of its signed January 29 Extension, after Purchaser's delivery of the Termination Notice, was not valid to unilaterally extend the PSA; (6) Seller's delivery of the January 29 Extension, post-termination of the PSA, constituted conduct inconsistent with (a) a desire to treat the PSA as repudiated and breached by Purchaser, or (b) a desire to terminate the PSA by Seller, and thus constituted a waiver of (or created an estoppel against) any right to terminate the PSA or make any claim against the Earnest Money; (7) if Seller's signing and delivery of the January 29 Extension was, arguendo, a valid extension of the PSA, Seller's failure to attempt to seek Bankruptcy Court approval of the PSA, prior to January 29, 2016, was a default by Seller under the PSA, for which Purchaser is entitled to the return of the Earnest Money; and (8) for the above reasons, Purchaser is entitled to the Earnest Money, plus interest thereon.[81]

---

[81] While the court is granting summary judgment on Purchaser's declaratory judgment cause of action, the court is denying summary judgment on Purchaser's remaining breach of contract claim.  Moreover, the court believes that Purchaser's request for summary judgment on Seller's remaining affirmative defenses and counterclaims is mooted by this court's ruling on the declaratory judgment cause of action.

### C.  *Attorney's Fees.*

As previously stated, the court is required to enforce a contract as written where the contract language is unambiguous.  Section 9.3 of the PSA entitled "Legal Fees" provides that:

> In the event either party to this Agreement commences legal action of any kind to enforce the terms and conditions of this Agreement, the prevailing party in such litigation will be entitled to collect from the other party all costs, expenses and attorney['s] fees incurred in connection with such action.[82]

This language is unambiguous and, having prevailed on its declaratory judgment action, Purchaser is also entitled to summary judgment on its attorney's fees request pursuant to the terms of the PSA.[83]  However, the court does not believe that such claim is entitled to administrative expense/priority status pursuant to sections 503(b) or 507 of the Bankruptcy Code (as Purchaser has argued) based upon the Fifth Circuit's ruling in *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385 (5th Cir. 2001), which held that a prevailing party in a suit brought by a chapter 7 trustee for breach of a prepetition contract is not entitled to administrative priority of its attorney's fee claim.  In *Jack/Wade Drilling,* the prevailing party in a breach of contract dispute brought by a chapter 7 trustee postpetition requested that its award of attorney's fees be given administrative expense status under section 503(b)(1)(A) of the Bankruptcy Code, relying on the Supreme Court's decision in *Reading Co. v. Brown*, 391 U.S. 471 (1968), which held that, when a third party is damaged by

---

[82] *See* Purchaser App., Purchase and Sale Agreement, § 12.2 [DE # 14-1 in the AP].

[83] To the extent that such contract language could be considered ambiguous, the court also finds that Purchaser is entitled to an award of attorney's fees pursuant to sections 37.009 and 38.001 of the Tex. Civ. Prac. & Remedies Code.  Section 37.009 of the Tex. Civ. Prac. & Rem. Code provides that "[i]n any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."  Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2016).  Moreover, section 38.001 of the Tex. Civ. Prac. & Rem. Code provides that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: . . . (8) an oral or written contract."  Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West 2016).

the wrongful conduct of a receiver in the course of operating the debtor's estate, it would be unfair to force that party to share equally with those creditors for whose benefit the estate was being operated. While noting that the *Reading* exception has been applied and recognized by nearly every Court of Appeals in the nation, the Fifth Circuit held that "[n]o Court of Appeals, however has extended *Reading* to cover debts incurred by a non-wrongful post-petition action to liquidate a chapter 7 bankruptcy estate"[84] and found that "*Reading* was not intended to grant priority to postpetition attorney fee awards resulting from a trustee's good faith attempt to liquidate the debtor's estate by bringing suit on a pre-petition contract."[85] Here, there is no summary judgment evidence that Seller's counterclaims and defenses were frivolous or brought in bad faith. Accordingly, while this court finds that Purchaser is entitled to (as part of its declaratory judgment cause of action) an award of reasonable attorney's fees under the terms of the PSA, such claim should not be given administrative expense status pursuant to sections 503(b) and 507 of the Bankruptcy Code. Accordingly, it is

**ORDERED** that Purchaser, Manchester EB-5, LLC, is entitled to summary judgment against Seller, Forest Park Realty Partners III, LP, on its declaratory judgment cause of action (including its request for reasonable attorney's fees at an amount to be determined at a future hearing); and it is further

---

[84] Pursuant to sections 1106 and 1107 of the Bankruptcy Code, the debtor-in-possession (*i.e.*, Seller) would be the equivalent of a chapter 7 trustee in a chapter 11 bankruptcy case.

[85] *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 388-89 (5th Cir. 2001). Note in support of the contention that its attorney's fees should be given administrative expense status, Purchaser cited to the Ninth Circuit BAP case of *Irmas Family Trust v. Madden (In re Madden)*, 185 B.R. 815, 819 (B.A.P. 9th Cir. 1995). In *Madden*, the bankruptcy appellate panel of the Ninth Circuit adopted a broad interpretation of *Reading* and granted administrative priority to an award of attorney's fees based on a provision of a prepetition contract between the debtor and a third party. However, the Fifth Circuit noted in *Jack/Wade Drilling* that the holding in *Madden* was **disavowed** by the Ninth Circuit in *In re Abercrombie,* 139 F.3d 755, 759 (9th Cir. 1998). *Jack/Wade Drilling, Inc.*, 258 F.3d at n.2 (emphasis added).

**ORDERED** that Purchaser, Manchester EB-5, LLC, shall file a fee application in the Adversary Proceeding within thirty (30) days of entry of this Memorandum Opinion and Order, and that the fee application shall be set for hearing (on at least 24 days' notice to Seller, Forest Park Realty Partners III, LP) for this court's consideration as an unsecured claim in the Bankruptcy Case; and it is further

**ORDERED** that Purchaser, Manchester EB-5, LLC, shall upload a Final Judgment that is consistent with this Memorandum Opinion and Order.

*** **END OF MEMORANDUM OPINION AND ORDER** ***